[780 NYS2d 600]

In the Matter of RICHARD L. WERTIS (Admitted as RICHARD LAWRENCE WERTIS), a Suspended Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, August 12, 2004

**APPEARANCES OF COUNSEL**

*Thomas J. Cahill, Chief Counsel, Departmental Disciplinary Committee*, New York City (*Vitaly Lipkansky* of counsel), for petitioner.

No appearance for respondent.

**OPINION OF THE COURT**

Per Curiam.

Respondent Richard L. Wertis was admitted to the practice of law in the State of New York by the Second Judicial Department on March 28, 1979, as Richard Lawrence Wertis. At all times relevant to this proceeding, he has maintained an office for the practice of law within this Department.

By order entered June 5, 2003, this Court granted a motion by the Departmental Disciplinary Committee to suspend respondent from the practice of law on an interim basis, based on uncontested evidence of professional misconduct posing an immediate threat to the public interest (*Matter of Wertis*, 307 AD2d 15 [2003]). In July 2003, the Committee served respondent with a notice charging him with the following misconduct: conversion and misappropriation of funds from a trust account of which he served as trustee, in violation of Code of Professional Responsibility DR 1-102 (a) (4) and DR 9-102 (a) (22 NYCRR 1200.3, 1200.46); deceiving an attorney the parents of the trust beneficiary had retained to conduct an audit of the account, in violation of DR 1-102 (a) (4); and, through the foregoing actions, having engaged in conduct adversely reflecting on his fitness as a lawyer, in violation of DR 1-102 (a) (7).

The material facts, which are undisputed, were established at a hearing held before a Referee on September 24, 2003, as well as by respondent's admissions in a prehearing stipulation between the parties. In 1987, a 2½-week-old baby, Carlina White-Tyson, was abducted from Harlem Hospital and has never been found. Respondent represented Carlina's father, Carl Tyson, and Carlina's mother, Joy White, in a federal civil rights lawsuit against the New York City Health and Hospitals Corporation and, in 1992, obtained a $750,000 settlement. Tyson and White were awarded $162,643.28 each, and each of them contributed half of their settlement funds, for a total of $162,643.28, into a trust created for Carlina's benefit should she be found by her 21st birthday (July 15, 2008). In 1993, respondent was named trustee of Carlina's trust.

Respondent made two unauthorized withdrawals from Carlina's trust account during his tenure as trustee, of $1,781.85 on January 12, 1996, and of $5,000 on September 29, 1997. These conversions were discovered around October 2001 by Lisa Newfield, Esq., an attorney Carlina's father had retained to

investigate respondent's management of the trust account when status reports ceased to be forthcoming. In response to Newfield's inquiry into the reason for the withdrawals, respondent falsely informed her that he inadvertently withdrew funds from the wrong account. In addition, respondent misrepresented to Newfield the reason for his deposit of $1,600 into the account on July 6, 1999, stating that it was a mistaken deposit. After Newfield's discovery of the conversions, respondent resigned as trustee effective May 16, 2002, repaid the aforementioned unauthorized withdrawals with interest, and signed a settlement agreement with Carlina's parents releasing him from further civil liability.

By report dated November 22, 2003, the Referee sustained all of the charges against respondent. At the subsequent sanction hearing, respondent admitted that he knew his conduct was wrong. Respondent explained that he resorted to such misconduct because his two major clients were slow in paying him, and he expected to cover the withdrawals when those clients paid their delinquent bills. Respondent testified that his purpose in converting the funds was to make overdue mortgage payments on his house, which he feared would be foreclosed.

The Referee recommended that respondent be disbarred. The Referee observed, in mitigation of respondent's offense, that he had no prior disciplinary history, and that three witnesses had given highly positive testimony concerning respondent's character. The Referee further found, however, that respondent's reimbursement of the converted funds was "involuntary," since it was made years after the conversion, and only after Newfield's audit. The Referee also opined that there was "every reason to believe that the withdrawals by respondent would have continued had not [Newfield's] intervention occurred." The Referee credited respondent's efforts at repayment by waiver of several trust commissions, but found that respondent failed to show any evidence that he had satisfied the accounting prerequisites to entitlement to such commissions.

After hearing oral arguments on January 20, 2004, a Hearing Panel issued a report, dated January 27, 2004, that concurred with the Referee's report in its entirety. The Panel acknowledged that respondent had attempted to replenish the trust account by a deposit from his own funds and by not drawing commissions in 1998, 2000, and 2001. The Panel also recognized that respondent's remorse for his wrongdoing was genuine, that his 25 years of practice were otherwise unblemished, and that he

had not used the relatively small amount of money he converted "for fancy cars, clothes or vacations." Nonetheless, the Panel concluded that, under any reasonable view of the record, extremely unusual circumstances of the kind that might warrant a lesser sanction than disbarment were not present. The Panel noted that many lawyers face financial pressure as the result of slow-paying clients, that respondent apparently had been "nowhere near to losing his house through a foreclosure," and that the trust beneficiary—a kidnapped child—was unusually vulnerable.

The Committee now moves for an order, pursuant to 22 NYCRR 603.4 (d) and 605.15 (e), confirming the findings of fact and conclusions of law of the Referee and the Hearing Panel, and disbarring respondent. We agree that the record establishes that respondent is guilty of each of the charges against him, and that, under all of the circumstances, disbarment is the appropriate sanction. We have consistently adhered to the position that, "[a]bsent extremely unusual mitigating circumstances," an attorney who has intentionally converted client funds is "presumptively unfit to practice law" and should be disbarred (*Matter of Birnbaum*, 308 AD2d 180, 183 [2003]). In *Birnbaum*, for example, an attorney with an otherwise unblemished 30-year career was disbarred based on his conversion of client funds, notwithstanding that the attorney had fully cooperated with the Committee, had not injured any client, and had repaid all converted funds before receiving any demand from the client to do so.

Here, notwithstanding respondent's lack of a prior disciplinary history, his generally good character, and the mitigating factors that are present, he admittedly misappropriated—for personal reasons, and on more than one occasion—trust funds held on behalf of a kidnapped infant. Moreover, he engaged in deceit, more than once, for the purpose of concealing such misconduct. As the Hearing Panel concluded, "[a]ny sanction less than disbarment would send the wrong message to the Bar, namely, that mere financial stress resulting in a conversion of client assets may carry a sanction less than disbarment."

Accordingly, the motion of the Departmental Disciplinary Committee should be granted; the findings of fact, conclusions of law, and recommendation of the Referee and the Hearing Panel confirmed; and respondent disbarred from practice as an attorney and counselor-at-law, and his name stricken from the roll of attorneys and counselors-at-law in the State of New York, effective immediately.

BUCKLEY, P.J., MAZZARELLI, ANDRIAS, SAXE and FRIEDMAN, JJ., concur.

Respondent disbarred, and his name stricken from the roll of attorneys and counselors-at-law in the State of New York, effective the date hereof.